UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>U.S. Department of Justice<br>Antitrust Division<br>450 5th Street, NW<br>Suite 8000<br>Washington, DC 20001,<br><br>and<br><br>STATE OF TEXAS<br>Office of the Texas Attorney General<br>Antitrust Division<br>P.O. Box 12548<br>Austin, TX 78711,<br>          *Plaintiffs,*<br><br>v.<br><br>CONSTELLATION ENERGY<br>CORPORATION, INC.<br>1310 Point Street<br>Baltimore, MD 21231,<br><br>CALPINE CORPORATION<br>717 Texas Avenue, Suite 1000<br>Houston, TX 77001,<br><br>and<br><br>CPN CS HOLDCO CORP.<br>717 Texas Avenue, Suite 1000<br>Houston, TX 77001,<br>          *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.   25-cv-4235<br><br><br><br>**COMPLAINT** |

Constellation Energy Corporation, Inc. ("Constellation") seeks to buy one of its largest

rivals, Calpine Corporation ("Calpine"), in a proposed acquisition that would create the largest

1

wholesale power generator in the United States with a formidable array of assets. The combination of those assets would risk affording Constellation the opportunity to profitably raise the price of electricity for millions of citizens and businesses in Texas and parts of the mid-Atlantic, likely resulting in increased energy costs of more than $100 million per year. The United States and the State of Texas bring this suit to preserve competition.

## I. INTRODUCTION

1. Electricity is an essential resource to people and companies across the country. Whether storing food in refrigerators, keeping the lights on in workplaces, watching a football game, or powering lifesaving support systems in hospitals, Americans depend on electricity for almost every facet of their daily lives. Demand for electricity is increasing rapidly, as the population grows and innovative technologies like cloud computing and artificial intelligence rely ever more on energy-intensive data centers. In Texas, the highest level of electricity consumption (so-called "peak load") handled by its largest electrical grid is expected to increase by 72% from 2024 to 2030. In the multistate power grid that includes the mid-Atlantic, summer peak load is expected to increase by 3.1% per year over the next decade. Despite this rapidly increasing demand, it is challenging to add new reliable generation to the nation's power grids.

2. Consumers and businesses demand instantaneous access to electricity to avoid disruption to their lives and work. Demand for electricity changes depending on weather and patterns of social and business activity that vary with the time of day, day of week, and season of year. For example, peak demand may be reached during the hottest summer days or coldest winter nights, when air conditioning or electric heating are most needed. Lower demand may occur on some weekends or major holidays when many businesses are closed. Electricity must be produced and delivered in line with this fluctuating demand, and electrical grid operators call

upon power generators like Constellation and Calpine to turn power generation plants on or shut them off to balance the supply of electricity with demand.

3.     To determine which plants should be turned on or shut off, and how much electricity each plant should produce, the grid operator conducts daily and intra-day auctions. These electricity auctions set the prices paid to every generation unit. Constellation and Calpine compete against each other and against other generators in these auctions by submitting offers from each of their individual generation units to produce certain amounts of electricity at certain times and prices to meet demand. The offers of individual generation units are accepted from lowest to highest price until the total amount of electricity from the generation units combined satisfies the demand for a particular period. The price for the last unit's offer necessary to meet real-time demand, referred to as the market-clearing price, sets the price paid at that auction for every other individual unit that has received an accepted offer.

4.     In other words, the price of electricity is set by the highest price offered by the individual power generating unit whose offer is accepted. All other generating units with lower offers that had offers accepted receive the same market-clearing price for the electricity they produce within a given period, despite having offered lower prices. Because the same price is paid by all wholesale electricity customers, even small price increases driven by one generator's offer strategy, executed during specific times throughout the year, can lead to market-wide price increases, adding tens or even hundreds of millions of dollars annually in increased electricity bills for consumers and businesses.

5.     On January 10, 2025, Constellation announced plans to acquire Calpine for a net purchase price of $26.6 billion (the "Acquisition"). If allowed to proceed, the Acquisition would create the largest wholesale electricity generating company in the United States.

6. Constellation and Calpine each sell wholesale electricity to two of the nation's major electricity grids, among others. The Electric Reliability Council of Texas ("ERCOT") encompasses most of Texas, and PJM Interconnection LLC ("PJM") includes all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and the District of Columbia.

7. The Acquisition would eliminate substantial competition between Constellation and Calpine within both of these grids by increasing the opportunity for the combined firm to engage profitably in a strategy that withholds output from one of its plants, forcing the grid operator to call on a higher-cost plant to set the market price. Increasing the market-clearing price would benefit the combined firm's plants that have had offers accepted, as well as all other active plants in the market. The aggregation of Constellation and Calpine's portfolios of generation capacity within each of these two grids confers more opportunities for the combined firm to engage profitably in anticompetitive withholding that would raise wholesale electricity prices within those grids.

8. In short, the Acquisition would eliminate competition between Constellation and Calpine, thereby increasing Constellation's ability and incentive to anticompetitively withhold electricity to raise wholesale electricity prices beyond what either company could do today as independent competitors. A successful withholding strategy could result in increased retail electricity prices paid by tens of millions of residential, commercial, and industrial customers across Texas and the area that includes southeastern Pennsylvania, New Jersey, Delaware, and the eastern shores of Maryland and Virginia.

## II.  THE DEFENDANTS

9. Constellation is a Pennsylvania corporation headquartered in Baltimore, Maryland. Constellation is one of the largest competitive electric generation companies in the nation, as measured by owned and contracted megawatts.

10. In ERCOT, Constellation owns or exercises control over two combined-cycle natural gas plants and one steam turbine plant. In addition, it has a 44% interest in the South Texas Project nuclear plant and two wind farms. Constellation's combination of nuclear, wind, and natural gas electricity power plants collectively have the capacity to generate approximately 5,000 megawatts (MW) of electricity in Texas. (For context, one megawatt serves between 800 to 1,000 homes.)

11. In PJM, Constellation owns or exercises control over 25 total plants and has a partial ownership interest in three. This includes combined-cycle natural gas plants, nuclear plants, coal plants, oil plants, and solar and wind renewals. These plants collectively provide more than 20,000 MW of electric capacity across PJM.

12. Calpine is a Delaware corporation headquartered in Houston, Texas. Calpine is the largest generator of electricity from natural gas and geothermal resources in the United States.

13. In ERCOT, Calpine owns or exercises control over 13 combined-cycle plants and one combustion turbine natural gas plant. In addition, Calpine is constructing another combustion turbine natural gas plant expected to come online in 2026 and holds a 28% interest in one additional operating combined-cycle natural gas plant. Calpine's power plants collectively have the capacity to generate approximately 9,000 MW of electricity, making it the third-largest electricity generation supplier in the state.

14. In PJM, Calpine owns or exercises control over 14 total plants, including natural gas plants, oil plants, and solar facilities. These plants collectively provide more than 5,000 MW of electric capacity.

15. CPN CS Holdco Corp. ("Holdco") is a Delaware corporation headquartered in Houston, Texas and a direct wholly owned subsidiary of Calpine. Calpine created Holdco as a vehicle for its sale to Constellation.

### III. HOW ELECTRICITY IS GENERATED AND SOLD

#### A. Wholesale Electricity

16. Electricity supplied to retail customers is produced at power plants. Wholesale electricity is electricity that is generated for "sale for resale" to utilities or retail electric providers that in turn resell it to end consumers, such as households and businesses. Power plants often contain several individual generating units that transform energy from fuel or a renewable resource into electricity. Important generating technologies in these units include steam turbines, combustion turbines, and combined-cycle turbines powered by natural gas, oil, or coal, as well as nuclear reactors, wind turbines, and solar panels.

17. Generating units vary considerably in their operating costs, which are determined primarily by the cost of fuel and how efficiently that fuel can be converted into electricity.

- *Renewable* units, such as solar farms and wind turbines, have very low operating costs, but can operate only when the sun is shining or the wind is blowing.

- *Baseload* units, such as nuclear plants and some coal-fired steam turbine units, also have relatively low operating costs and provide consistent generation throughout the day and across each season of the year. Nuclear plants are designed to operate at full capacity unless they are offline for refueling outages. For many coal units, it is

- impractical to turn them on and off on a short-term basis because of long startup times and mechanical stress from cycling the units on and off.

- *Mid-merit* units, such as combined-cycle natural gas units and some coal steam turbines, can typically be turned on or have their output adjusted more quickly than baseload units.

- *Peaking* units, such as oil- and gas-fired combustion or gas-fired steam turbine units, tend to run only during periods of high (or "peak") electricity demand. They typically have the highest operating costs of any generation units but are also the easiest to turn on and shut off. This makes them critical for balancing supply and demand to keep the lights on without overloading the system.

18. Electricity generated at a plant is transported via an extensive set of interconnected high voltage lines and equipment, known as the transmission grid, to lower voltage distribution lines that relay electricity to homes and businesses. Transmission grid operators closely monitor the grid to prevent too little or too much electricity from flowing over the grid, either of which can risk widespread blackouts through damage to the lines, equipment, or generating units connected to the grid. To avoid damage and service interruptions, grid operators manage a grid to prevent additional electricity from flowing over a transmission line as that line approaches its operating limit (a "transmission constraint").

    **B.    The Electric Reliability Council of Texas**

19. ERCOT is an independent system operator that serves as the electricity grid and market operator for most of Texas. This means it manages the purchase of wholesale electricity from Constellation, Calpine, and their competitors, as well as the resale and transmission of that electricity to utilities and retail electric providers that directly serve end customers.

7

20. ERCOT is a membership-based nonprofit corporation subject to oversight by the Public Utility Commission of Texas. Its members include consumers, cooperatives, generators, power marketers, retail electricity providers, investor-owned electric utilities, transmission and distribution providers, and municipally owned electric utilities.

### C. PJM Interconnection

21. PJM is a regional transmission organization that manages the wholesale electricity market and transmission grid that supplies electricity to all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and the District of Columbia.

22. PJM is a private, nonprofit organization whose members include transmission line owners, generation owners, distribution companies, retail customers, and retail electricity suppliers.

23. PJM manages the largest transmission grid in the United States, which provides electricity to more than 67 million people. Each year, PJM is responsible for overseeing more than $25 billion in wholesale electricity sales.

### D. ERCOT and PJM Use Auctions to Set the Price of Electricity

24. ERCOT and PJM each oversee two auctions to set the price of wholesale electricity and ensure there is enough supply to meet demand in their respective parts of the country. The first is a "day-ahead" auction that sets hourly prices for the next day, and the second is a "real-time" auction that sets prices for each five-minute interval throughout the operating day to reflect changing demand for electricity at specific times. In both auctions, competing generators, including Constellation and Calpine, submit offers for each of their generation units to sell electricity to electricity retailers at a specific price. These offers are the

primary means by which electricity generators compete to supply electricity in ERCOT and PJM and drive the price consumers ultimately pay for it.

25. In the day-ahead auctions, each buyer typically submits a bid to ERCOT or PJM that identifies the amount of electricity that the buyer expects to need for each hour of the next day. ERCOT or PJM then adds up the bids to determine how much total electricity is expected to be demanded by buyers each hour. Each generator offering electricity in the day-ahead market (such as Constellation and Calpine) submits an offer to sell electricity to ERCOT or PJM that indicates, for each generating unit, the amount of electricity it is willing to sell the next day and the price at which it is willing to sell.

26. Subject to the physical limitations of their transmission grids, ERCOT and PJM seek to "dispatch" generating units, that is, to call on them to generate electricity in "merit" order, meaning from lowest offer price to highest. In the day-ahead auction, subject to expected transmission constraints, ERCOT and PJM take the least expensive offer first and then accept offers at progressively higher prices until the needs for each hour of the next day are covered. This minimizes the total cost of generating the electricity required for the next day. The clearing price for any given hour is determined by the generating unit with the highest offer price that is needed for that hour. All other sellers for that hour receive that identical price regardless of the individual unit's own offer price or costs. So, a generating unit that offers a lower price to ERCOT or PJM is paid the higher clearing price if electricity from additional, higher-priced generating units is needed to meet demand.

27. The real-time auctions reconcile the outcome of the day-ahead auctions with actual supply and demand. ERCOT and PJM follow the same auction mechanism as in the day-ahead auctions, by accepting sellers' offers in merit order, subject to the physical and

9

engineering limitations of the transmission grid, until there is enough electricity to meet actual demand. In the real-time auctions, however, ERCOT and PJM set prices for each five-minute interval of the day.

28. Transmission constraints sometimes affect PJM's merit order. When the lowest-cost generation cannot be dispatched because it would overload a transmission constraint, it is called "congestion." To avoid congestion while still satisfying demand, PJM must call on higher-priced units that, given their location on the grid, do not overload transmission constraints. When this happens, prices are lower on one side of the constraint and higher on the other side. In other words, when the capacity of the transmission lines connecting two regions within PJM is reached so that electricity cannot flow from one region to another, the demand within each region has to be met by electricity that is generated within that region. In these situations, competition and thus pricing can be different across the different regions within PJM.

## IV. THE RELEVANT MARKETS FOR EVALUATING THE PROPOSED ACQUISITION

### A. Wholesale Electricity is a Relevant Product Market

29. Wholesale electricity is a relevant product market for evaluating the potential competitive impact of the Acquisition. And each hourly increment in which wholesale electricity is sold in ERCOT's or PJM's "day-ahead" auction, as well as each five-minute increment in the ERCOT or PJM "real-time" auctions, constitutes a separate relevant product market. This is because electricity available in one time period is not a substitute for electricity available in another time period (notwithstanding the ability to use batteries to some extent to transfer electricity from one time period to another). While supply and demand for wholesale electricity can vary in different periods, both auctions share a common feature: in the event of a small but significant non-transitory increase in the price of wholesale electricity at relevant times, not

enough purchasers are likely to switch away from wholesale electricity to make that increase unprofitable. Additionally, in the event of a small but significant non-transitory increase in the price of wholesale electricity within an hourly or five-minute interval, not enough purchasers would switch to consuming wholesale electricity in a different time period to make that price increase unprofitable. This means that each of these specific auction time intervals markets is a relevant product market and a "line of commerce" within the meaning of Section 7 of the Clayton Act.

30. While each of these specific time intervals is a relevant product market, they can be aggregated into a "cluster market" for analytical convenience for considering whether the Acquisition violates the antitrust laws. For example, all 24 hours in a single day in either PJM or ERCOT's "day-ahead" auction could be aggregated into one market, as could all five-minute intervals in a single hour in PJM or ERCOT's "real-time" auction. Separate cluster markets could also be created for periods of time that exhibit similar market contexts and competitive dynamics—for example, summer afternoons or winter nights.

**B.     ERCOT is a Relevant Geographic Market**

31. The region covered by ERCOT is a relevant geographic market for evaluating the potential competitive impact of Constellation's purchase of Calpine and a "section of the country" within the meaning of Section 7 of the Clayton Act. ERCOT serves more than 27 million Texans, who collectively account for about 90% of the state's electricity demand. In 2024, ERCOT was responsible for overseeing the sale of more than $14.4 billion in wholesale electricity.

32. In the event of a small but significant non-transitory increase in the price of wholesale electricity within ERCOT, not enough purchasers in the ERCOT region are likely to

switch to purchasing from regions outside ERCOT to make that increase unprofitable. At its annual peak, electricity demand in ERCOT exceeds 85,000 MW. ERCOT's connections to Mexico's grid and to the Southwest Power Pool grid, which collectively can allow about 1,200 MW of electricity to flow into ERCOT, are insufficient to prevent generators from imposing a small but significant non-transitory price increase within ERCOT.

        C.        **PJM Coastal Mid-Atlantic is a Relevant Geographic Market**

33. The PJM Coastal Mid-Atlantic geographic area is a relevant geographic market for evaluating the potential competitive impact of Constellation's purchase of Calpine and a "section of the country" within the meaning of Section 7 of the Clayton Act. The PJM Coastal Mid-Atlantic geographic area is a distinct area within the PJM region that includes southeastern Pennsylvania, New Jersey, Delaware, and the eastern shores of Maryland and Virginia. In 2024, approximately $4 billion of wholesale electricity was generated and supplied to more than 10 million people and businesses in PJM Coastal Mid-Atlantic.

34. PJM Coastal Mid-Atlantic is affected by a major transmission constraint located near the Maryland-Pennsylvania border, called Nottingham, that divides PJM Coastal Mid-Atlantic from the rest of the PJM region. Generators within PJM Coastal Mid-Atlantic frequently sell electricity into other areas to the west and south. But when transmission lines are constrained, the amount of electricity that generators within PJM Coastal Mid-Atlantic can sell outside of the area is limited. As a result, electricity prices in PJM Coastal Mid-Atlantic often differ from prices in other areas within the PJM region.

35. When Nottingham is constrained, purchasers of wholesale electricity for use in PJM Coastal Mid-Atlantic have limited ability to turn to generation originating outside of PJM Coastal Mid-Atlantic. During these times, the amount of electricity that purchasers could obtain

from generators outside PJM Coastal Mid-Atlantic is insufficient to deter generators located in PJM Coastal Mid-Atlantic from imposing a small but significant non-transitory price increase.

## V.   THE ACQUISITION IS REASONABLY LIKELY TO RAISE ELECTRICITY PRICES

36. The combination of Constellation and Calpine's electricity generating units serving ERCOT and PJM Coastal Mid-Atlantic would eliminate competition between them and enhance Constellation's post-Acquisition ability and incentive to withhold electricity to raise wholesale electricity price anticompetitively in those markets.

### A.   Constellation's Ability and Incentive to Raise Wholesale Electricity Price in ERCOT

37. The Acquisition would increase opportunities for Constellation to profitably engage in a withholding strategy that would increase wholesale electricity prices in Texas. The Acquisition would almost triple Constellation's generation capacity to nearly 14,000 MW in ERCOT and add to its Texas portfolio a fleet of gas plants that have relatively higher operating costs than Constellation's current fleet. Constellation has three gas plants—one steam turbine plant and two combined-cycle plants—that total approximately 3,500 MW. It also has a 44% share in a nuclear plant with a capacity of approximately 2,600 MW and owns two small wind generating assets that collectively have about 170 MW of capacity. Calpine owns or controls 13 combined-cycle gas plants in ERCOT and has a minority share in a fourteenth plant that together have 9,000 MW of capacity.

38. The Acquisition would make Constellation the second-largest electric generation company in Texas, controlling more than 12% of ERCOT's generating capacity and over 20% of the natural gas generation capacity in ERCOT that often sets the clearing price. This portfolio of gas generation plants represents the "marginal fuel": natural gas sets the price for all customers

13

in ERCOT the majority of the time, and is particularly valuable in ERCOT, where the electricity grid relies on gas to complement and support its increasing use of intermittent renewable resources such as sun and wind to generate electricity.

39. The Acquisition would give Constellation a broader portfolio of assets that can be turned on and shut off more readily and quickly would enable it to more frequently and more strategically withhold electricity at lower opportunity costs in order to enjoy increased market prices on the other generation units it continues to operate. By withholding a unit—or combination of units—from ERCOT's "day-ahead" or "real-time" auctions, Constellation could force ERCOT to accept an offer from a higher-priced unit. This would in turn raise the market-wide price to the benefit of Constellation's other units. The additional revenues received by Constellation's lower-cost generating unit(s) because of anticompetitively higher market-wide prices would frequently more than compensate for the lost profits from the generating unit(s) withheld. In other words, after the Acquisition, Constellation would be in a better position than either it or Calpine are today as independent competitors to profit from withholding output and raising the market-wide price to anticompetitive levels.

40. Because every other generation unit needed to meet demand in ERCOT would also receive the anticompetitively higher market-wide prices, the market-wide harm is much greater than simply Constellation's increased profits and the harm would be felt across the entire region. A small price increase that results in only millions in profit to Constellation could result in more than $100 million in harm to Texas consumers.

**B.    Constellation's Ability and Incentive to Raise Wholesale Electricity Price in PJM Coastal Mid-Atlantic**

41. The Acquisition would enhance Constellation's ability to withhold output and raise the wholesale electricity price in PJM Coastal Mid-Atlantic by increasing its ownership of

mid-merit and peaking units, which can be turned on or shut off more quickly than other types of generation assets. The Acquisition would enable Constellation to more frequently and more strategically withhold generation capacity at lower opportunity costs.

42. Constellation can withhold capacity in several ways, such as by submitting high offers in the PJM auctions for some of the capacity from its higher-cost units so that they are not called on to produce electricity. By withholding capacity from a unit—or combination of units—from PJM's "day-ahead" or "real-time" auction, Constellation could force PJM to accept an offer from a higher-priced unit in order to meet demand. This would raise the price in PJM Coastal Mid-Atlantic to the benefit of Constellation's other units supplying power to this area.

43. The additional revenues received by Constellation's lower-cost generation units, including its nuclear plants, because of anticompetitively higher prices in PJM Coastal Mid-Atlantic would more than compensate for the lost profits from the generating unit(s) withheld. In other words, after the Acquisition, Constellation would be in a better position than either it or Calpine is today as an independent competitor to profit from reducing output and raising the wholesale electricity price in PJM Coastal Mid-Atlantic.

44. Increasing Constellation's incentive and ability to profitably withhold capacity for PJM Coastal Mid-Atlantic increases the likelihood that Constellation will exercise market power after its acquisition of Calpine.

## VI.    POTENTIAL ENTRY WOULD NOT OFFSET ANTICOMPETITIVE EFFECTS

45. Entry into wholesale electricity markets by building new generation capacity in either ERCOT or PJM Coastal Mid-Atlantic requires significant capital investment in generating equipment, infrastructure, and technology, and generally takes many years, considering the necessary environmental, safety, zoning, and regulatory approvals.

46. In both ERCOT and PJM Coastal Mid-Atlantic, recent supply chain dynamics and rising inflation have made it more difficult and expensive for companies to procure transformers and turbines to build gas-fired generation plants. Furthermore, the anticipated increase in electricity demand (*e.g.*, to power AI data centers as well as population growth and increased economic activity) has led to long queues for the delivery of new gas turbines, so that new entry is unlikely to be timely.

47. In PJM, interconnection queue wait times, or the duration from initial connection request to commercial operations, have increased substantially since the early 2000s. Building new high-voltage transmission that would relieve the constraints that limit the flow of electricity out of PJM Coastal Mid-Atlantic would also generally take many years, and require significant capital investment and multiple environmental, safety, zoning, and regulatory approvals.

48. Entry into wholesale electricity markets in ERCOT and PJM Coastal Mid-Atlantic would not be timely, likely, or sufficient in magnitude, character, or scope to defeat an anticompetitive price increase resulting from the Acquisition.

49. To the extent that there is new entry, including entry from renewable generation units, it will likely lag behind the substantial increases in demand projected in ERCOT and PJM Coastal Mid-Atlantic.

50. Defendants also cannot demonstrate verifiable, merger-specific efficiencies sufficient to offset the Acquisition's anticompetitive effects.

## VII.  JURISDICTION AND VENUE

51. The United States brings this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

52. The State of Texas brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents and to prevent and restrain the violation by Defendants of Section 7 of the Clayton Act, 15 U.S.C. § 18.

53. Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce. The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. § 1331, 1337(a), and 1345.

54. Defendants have consented to venue and personal jurisdiction in this judicial district. Venue is therefore proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

## VIII. VIOLATION ALLEGED

55. The Acquisition, if it were consummated, likely would lessen competition substantially for wholesale electricity in ERCOT and PJM Coastal Mid-Atlantic, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

56. Unless restrained, the Acquisition likely would have the following anticompetitive effects, among others:

   (a) Competition in wholesale electricity markets in ERCOT and PJM Coastal Mid-Atlantic would be substantially lessened;

   (b) Constellation would wield increased market power in wholesale electricity markets in ERCOT and PJM Coastal Mid-Atlantic; and

   (c) Prices for wholesale electricity in ERCOT and PJM Coastal Mid-Atlantic would increase.

## IX.     REQUEST FOR RELIEF

57.     Plaintiffs request that this Court:

(a) Adjudge Constellation's proposed acquisition of Calpine to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)  Permanently enjoin and restrain Defendants from consummating the proposed acquisition of Calpine by Constellation or from entering into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Calpine and Constellation;

(c) Award the Plaintiffs their costs for this action; and

(d) Award the Plaintiffs such other and further relief as the Court deems just and proper.

Case 1:25-cv-04235   Document 1   Filed 12/05/25   Page 19 of 20

Dated: December 5, 2025

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

| | |
|---|---|
| ABIGAIL A. SLATER (D.C. Bar #90027189)<br>Assistant Attorney General | /s/ Joseph Chandra Mazumdar<br>JOSEPH CHANDRA MAZUMDAR*<br>JOHN M. BRIGGS (D.C. Bar #90035937) |
| MARK H. HAMER (D.C. Bar #1048333)<br>Deputy Assistant Attorney General | J. RICHARD DOIDGE<br>JEREMY EVANS (D.C. Bar #478097)<br>WILLIAM M. MARTIN |
| RYAN DANKS<br>Director of Civil Enforcement | MICHAEL T. NASH<br>MICHELLE PARK (D.C. Bar #90005251)<br>KATHRYN TRINKA (D.C. Bar #90010251) |
| GEORGE C. NIERLICH (D.C. Bar #1004528)<br>Deputy Director of Civil Enforcement | Trial Attorneys |
| PATRICIA C. CORCORAN<br>(D.C. Bar #461905)<br>Acting Chief, Transportation, Energy &<br>Agriculture Section | HENRY C. SU (DC Bar #441271)<br>PAUL J. TORZILLI (DC Bar #986767)<br>Senior Litigation Counsel |
| KATHERINE CELESTE SPEEGLE<br>Assistant Chief, Transportation, Energy, &<br>Agriculture Section | United States Department of Justice<br>Antitrust Division<br>Transportation, Energy &<br>Agriculture Section |
| CATHERINE R. REILLY<br>(D.C Bar #1002308)<br>Acting Assistant Chief, Transportation, Energy,<br>& Agriculture Section | 450 Fifth Street, NW, Suite 8000<br>Washington, DC 20530<br>Telephone: (202) 353-1560<br>Email: chan.mazumdar@usdoj.gov |
| | *LEAD ATTORNEY TO BE NOTICED |

19

FOR PLAINTIFF STATE OF TEXAS:

| | |
|---|---|
| KEN PAXTON<br>Attorney General | THOMAS D. YORK<br>Chief, Antitrust Division |
| BRENT WEBSTER<br>First Assistant Attorney General | */s/ Cole Pritchett*<br><br>COLE PRITCHETT<br>Assistant Attorney General<br>Texas State Bar No. 24134376 |
| RALPH MOLINA<br>Deputy First Assistant Attorney General | |
| AUSTIN KINGHORN<br>Deputy Attorney General for Civil Litigation | KATHERINE DANNENMAIER<br>Assistant Attorney General<br>Texas State Bar No. 24125093 |
| OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548<br>Austin, Texas 78711-2548<br>(512) 936-1162 | WILLIAM SHIEBER<br>Senior Staff Attorney<br>Texas State Bar No. 24012167 |
| | COUNSEL FOR THE STATE OF TEXAS |