**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>and<br><br>STATE OF TEXAS<br>*Plaintiffs,*<br><br>v.<br><br>CONSTELLATION ENERGY CORPORATION,<br><br>CALPINE CORPORATION,<br><br>and<br><br>CPN CS HOLDCO CORP.<br>*Defendants.* | Case No. 25-cv-4235-ABJ |

**COMPETITIVE IMPACT STATEMENT**

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)–(h) (the "APPA" or "Tunney Act"), the United States of America files this Competitive Impact Statement related to the proposed Final Judgment filed in this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

On January 10, 2025, Constellation Energy Corporation ("Constellation") announced its agreement to acquire Calpine Corporation ("Calpine") for a net purchase price of $26.6 billion (the "Acquisition"), a transaction that would create the largest wholesale electricity generating company in the United States. The United States and the State of Texas (collectively, the

"Plaintiffs"), filed a civil antitrust Complaint on December 5, 2025, seeking to enjoin the Acquisition.

The Complaint alleges that the likely effect of this Acquisition would be to substantially lessen competition for wholesale electricity in two relevant geographic markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. One market comprises the area operated by the Electric Reliability Council of Texas ("ERCOT"), an independent system operator that serves as the electricity grid and market operator for most of Texas. ERCOT's electricity is delivered to more than 27 million Texans, supplying approximately 90% of the state's electricity demand. In 2024, ERCOT oversaw the sale of more than $14.4 billion in wholesale electricity. The second market comprises the Coastal Mid-Atlantic area of the PJM Interconnection, LLC ("PJM"). PJM is a regional transmission organization that manages the largest electricity transmission grid in the United States. It serves all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and the District of Columbia, supplying electricity to more than 67 million Americans. The PJM Coastal Mid-Atlantic geographic area is a distinct area within PJM that includes southeastern Pennsylvania, New Jersey, Delaware, and the eastern shores of Maryland and Virginia. In 2024, approximately $4 billion of wholesale electricity was generated and supplied to more than 10 million people and businesses in PJM's Coastal Mid-Atlantic area.

Concurrent with filing the Complaint, the United States filed a proposed Final Judgment[1] and an Asset Preservation and Hold Separate Stipulation and Order ("Stipulation and Order"),[2] which are designed to remedy the loss of competition alleged in the Complaint.

---

[1] Proposed Final Judgment, *United States et al. v. Constellation Energy Corporation, et al.*, No. 25-cv-4235, ECF 2-2 (D.D.C. Dec. 5, 2025).

[2] Asset Preservation And Hold Separate Stipulation And Order, *United States et al. v. Constellation Energy Corporation, Inc.,* No. 25-cv-4235, ECF 2-1 (D.D.C. Dec. 5, 2025).

Under the proposed Final Judgment, which is explained more fully below, Constellation, Calpine, and CPN CS Holdco Corp. (collectively the "Defendants") are required to divest the Calpine electric generating facilities listed below.

In ERCOT:

- Jack A. Fusco Energy Center , located southwest of the city of Houston, Texas ("Jack A. Fusco"); and

- Calpine's minority ownership interest in the Gregory Energy Center, located northeast of the city of Corpus Christi, Texas ("Gregory").

In PJM:

- Bethlehem Energy Center, located in Bethlehem, Pennsylvania ("Bethlehem");

- Edge Moor Energy Center, located in Wilmington, Delaware ("Edge Moor");

- Hay Road Energy Center, located in Wilmington, Delaware ("Hay Road"); and

- York Energy Center (York 1 and York 2), located southeast of the city of York, Pennsylvania ("York").

The Stipulation and Order requires the Defendants to take certain steps to operate, preserve, and maintain the full economic viability, marketability, and competitiveness of the assets that must be divested pending entry of the proposed Final Judgment by this Court. Plant management and operations of the assets to be divested must be held entirely separate, distinct, and apart from Defendants' other operations.

For the four PJM electric generating facilities the Defendants must divest, the Stipulation and Order requires the Defendants to submit offers into the PJM day-ahead auction market, described in detail at Section II.B.2 below, at a price not greater than its costs. For each of these facilities, the Defendants must submit offers to this market at cost or lower, unless unable to do

so due to an outage, as defined in the Stipulation and Order. In the event of an outage, the Defendants must submit offers for all output that is unaffected by the outage. Similarly, for Jack A. Fusco, the Defendants must submit offers into ERCOT's day-ahead auction, described in detail at Section II.B.2 below, at a price not greater than its costs in accordance with the physical characteristics of the applicable units unless unable to do so due to an outage or because ERCOT has issued an Advanced Action Notice or Weather Watch as specified in the Stipulation and Order. In the event of an outage, ERCOT Advanced Action Notice, or ERCOT Weather Watch, the Defendants must submit offers for all output that is unaffected by the outage, ERCOT Advanced Action Notice, or ERCOT Weather Watch. The Stipulation and Order prohibits the Defendants from participating in the formulation, determination, or direction of the strategy for Gregory's offers into the ERCOT auction markets.

The purpose of these terms in the Stipulation and Order is to ensure that competition is maintained during the pendency of the required divestiture of the six Calpine electric generating facilities listed above.

The Plaintiffs and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS

### A. The Defendants and the Proposed Acquisition

Constellation is a publicly held Pennsylvania corporation headquartered in Baltimore, Maryland. The company is one of the largest competitive electric generation companies in the nation, as measured by owned and contracted megawatts, generating $23.6 billion in revenue in 2024. Constellation controls approximately 5,000 megawatts (MW) of electric generation

capacity in ERCOT and over 20,000 MW in PJM. For context, one MW serves between 800 to 1,000 homes.

Calpine is a privately held Delaware corporation headquartered in Houston, Texas. Calpine is the largest generator of electricity from natural gas and geothermal resources in the United States. Calpine's power plants collectively have the capacity to generate approximately 9,000 MW of electricity in ERCOT, making it the third-largest electricity generation supplier in the state. In PJM, Calpine owns or exercises control over 14 total plants. These plants collectively provide more than 5,000 MW of capacity.

Defendant CPN CS Holdco Corp. ("Holdco") is a Delaware corporation headquartered in Houston, Texas. It is a direct wholly owned subsidiary of Calpine that was created to serve as a vehicle for Calpine's sale to Constellation.

Pursuant to an Agreement and Plan of Merger dated January 10, 2025, Defendant Constellation proposes to acquire Defendant Calpine for a net purchase price of $26.6 billion.

### B.  The Acquisition's Competitive Effects

The Complaint alleges that the Acquisition would result in likely anticompetitive effects in the markets for wholesale electricity in ERCOT and PJM's Coastal Mid-Atlantic area.

#### 1.  Electricity Background

Generating companies such as Constellation and Calpine own power plants that produce electricity. Electric utilities and retail providers purchase that electricity from the generating companies and resell it to their end customers, such as households and businesses.

Power plants, which often contain several individual generating units, transform fuel or renewable resources into electricity. Steam turbines, combustion turbines, and combined-cycle

turbines powered by natural gas, oil, or coal, as well as nuclear reactors, wind turbines, and solar panels are important electric generating technologies.

The cost to operate generating units varies considerably, based primarily on the cost of fuel and the efficiency of converting that fuel into electricity:

- *Renewable* units, such as solar farms and wind turbines, have very low operating costs, but can operate only when the sun is shining or the wind is blowing.

- *Baseload* units, such as nuclear plants and some coal-fired steam turbine units, also have relatively low operating costs and provide consistent generation throughout the day and across each season of the year. Nuclear units are designed to operate at full capacity unless they are offline for refueling outages. For many coal units, it is impractical to turn them on and off on a short-term basis because of long startup times and mechanical stress from cycling the units on and off.

- *Mid-merit* units, including combined-cycle natural gas units and some coal steam turbines, can typically turn on or have their output adjusted more quickly than baseload units.

- *Peaking* units, such as oil- and gas-fired combustion or gas-fired steam turbine units, tend to run only during periods of high (or "peak") electricity demand. They typically have the highest operating costs of any generation units but are also the easiest to turn on and shut off. This makes them critical for balancing supply and demand to keep the lights on without overloading the system.

Electricity generated at a plant is transported via an extensive set of interconnected high voltage lines and equipment, known as the transmission grid, to lower voltage distribution lines that relay electricity to businesses and consumers in their homes. Operators, such as ERCOT and

PJM, monitor the transmission grid closely to prevent too little or too much electricity from flowing over the grid, either of which can risk widespread blackouts through damage to the lines, equipment, or generating units connected to the grid. To avoid damage and service interruptions, grid operators manage the grid to prevent additional electricity from flowing over a transmission line as it approaches its operating limit (a "transmission constraint").

### 2. ERCOT and PJM Use Auctions to Set the Price of Electricity

ERCOT and PJM each oversees two auctions that set the wholesale electricity price in their respective areas. These auctions are the primary means by which electricity generators compete to supply electricity in ERCOT and PJM and drive the price consumers ultimately pay for it.

The first auction is called the "day-ahead auction." Each generator offering electricity in the day-ahead market submits an individual offer for each of its participating generating units indicating the amount of electricity the unit is willing to sell each hour of the following day and the price at which it is willing to sell. Similarly, each buyer typically submits a bid identifying the amount of electricity that the buyer expects to need for each hour of the following day. ERCOT and PJM will take each of the bids and offers, add them up, and determine how much electricity will be demanded each hour.

ERCOT and PJM will then "dispatch" generating units to meet each hour's demand. Subject to the physical limitations of their transmission grids, ERCOT and PJM will call on individual units to operate in "merit" order, meaning that each will begin by accepting the least-expensive offer and thereafter, accept offers from units at progressively higher prices until the needs for each hour of the next day are met. The price offered by the last unit to be accepted to meet demand for an individual hour sets the clearing price for that hour. All other units whose

offers also have been accepted for that individual hour receive the price of that highest cost unit, regardless of their individual offer price (or their units' costs). Thus, a generator may be paid a higher clearing price than its own offer price if electricity from additional, higher-priced generating units is needed to meet demand.

The second auction is a "real-time" auction that operates functionally in the same way. However, it clears the same day the electricity is required and reconciles the results of the day-ahead auctions with actual supply and demand. In the real-time auctions, ERCOT and PJM set prices for each five-minute interval of the day rather than each hour as in the day-ahead auction.

### 3. Wholesale Electricity Markets

As alleged in the complaint, wholesale electricity is a relevant product for evaluating the competitive impact of the Acquisition. Each hourly increment in which wholesale electricity is sold in ERCOT's or PJM's "day-ahead" auction and each five-minute increment in the ERCOT or PJM "real-time" auctions is a separate relevant product market. This is because electricity in one time period is not a substitute for electricity in another time period. While supply and demand for wholesale electricity varies in different periods, both auctions share a common feature: in the event of a small but significant non-transitory increase in the price of wholesale electricity at relevant times, not enough purchasers are likely to switch away from wholesale electricity to make that increase unprofitable. Additionally, in the event of a small but significant non-transitory increase in the price of wholesale electricity within an hourly or five-minute time period, not enough purchasers would switch to consuming wholesale electricity in a different time period to make that price increase unprofitable. This means that each of these specific auction time periods is a relevant product market and a "line of commerce" within the meaning of Section 7 of the Clayton Act.

Although each of these specific time periods is a relevant product market, they can be aggregated into a "cluster market" for analytical convenience for considering whether the Acquisition violates the antitrust laws. For example, all 24 hours in a single day in either PJM or ERCOT's "day-ahead" auction could be aggregated into one market, as could all five-minute intervals in a single hour in PJM or ERCOT's "real-time" auction.

### 4. Geographic Markets

At times, transmission constraints within power grids limit the free flow of electricity across a geographic region. Energy produced on one side of a constraint cannot easily flow to the other side of the constraint once the transfer limit has been reached. Transmission constraints can affect electricity flow within ERCOT and PJM to varying degrees with PJM, in particular, impacted. When constraints arise, PJM cannot dispatch generating units in merit order if doing so would overload a transmission constraint, a concept called "congestion." To avoid congestion while still satisfying demand, PJM must call on higher-priced units that, given their grid location, do not overload the transmission constraint. When this happens, prices are lower on one side of the constraint and higher on the other side.

### a. PJM's Coastal Mid-Atlantic Market

The Complaint alleges that the PJM Coastal Mid-Atlantic geographic area is a relevant geographic market for evaluating the potential competitive impact of the Acquisition. PJM Coastal Mid-Atlantic is a distinct area within PJM that includes parts of southeastern Pennsylvania, New Jersey, Delaware, and the eastern shores of Maryland and Virginia.

PJM Coastal Mid-Atlantic is affected by Nottingham, a major transmission constraint located near the Maryland-Pennsylvania border that divides PJM Coastal Mid-Atlantic from the rest of the PJM region. Generators within PJM Coastal Mid-Atlantic frequently sell electricity

into other areas to the west and south. However, when transmission lines are constrained, the amount of electricity that generators within PJM Coastal Mid-Atlantic can sell outside of the area is limited. As a result, electricity prices in PJM Coastal Mid-Atlantic often differ from other areas within the PJM region.

When Nottingham is constrained, purchasers of wholesale electricity for use in PJM Coastal Mid-Atlantic have limited capability to turn to generation outside of PJM Coastal Mid-Atlantic. At such times, the amount of electricity that purchasers could obtain from generators outside PJM Coastal Mid-Atlantic is insufficient to deter generators located in PJM Coastal Mid-Atlantic from imposing a small but significant non-transitory price increase. Thus, PJM Coastal Mid-Atlantic is a relevant geographic market and a "section of the country" within the meaning of Section 7 of the Clayton Act.

### b.  ERCOT Market

The Complaint also alleges that the entire ERCOT region is a relevant geographic market for evaluating the potential competitive impact of the Acquisition. The ERCOT grid experiences very little congestion. In the event of a small but significant non-transitory increase in the price of wholesale electricity within ERCOT, not enough purchasers in the ERCOT region are likely to switch to purchasing from regions outside ERCOT to make that increase unprofitable. At its annual peak, the electricity in demand in ERCOT exceeds 85,000 MW. ERCOT's connections to Mexico's grid and to the Southwest Power Pool grid, which collectively can for approximately 1,200 MW of electricity to flow into ERCOT.  The volume of these power flows is insufficient to prevent generators from imposing a small but significant non-transitory price increase within

ERCOT. Thus, the region covered by ERCOT is a relevant geographic market and a "section of the country" within the meaning of Section 7 of the Clayton Act.[3]

### 5. Anticompetitive Effects

As alleged in the Complaint, the Acquisition risks substantially lessening competition in the ERCOT and PJM Coastal Mid-Atlantic wholesale electricity markets. The combination of Constellation and Calpine's electricity generating units serving ERCOT and PJM Coastal Mid-Atlantic would eliminate competition between them and enhance Constellation's post-Acquisition ability and incentive to withhold electricity to raise wholesale electricity price anticompetitively in those markets.

Under certain circumstances, a wholesale electricity generator, such as Constellation or Calpine, may profitably withhold electricity, leading to increased wholesale electricity prices. An operator of a generating unit may withhold capacity in several ways, including by submitting high offers for some of its higher-cost units into the day-ahead or real-time auctions so that its units are not dispatched. If a unit is withheld from an auction, then a higher-priced unit may need to take the place of the withheld capacity because the units are dispatched in merit order, that is from the lowest-priced unit to the highest until demand matches supply. Thus, withholding a unit (or units) can lead to a higher market-clearing price because the withheld units force ERCOT or PJM to accept higher-priced offers from units that end up setting the market clearing price. All accepted units are paid the identical price regardless of the unit's offer price or its operating cost. Withholding can be profitable for generating companies that offer multiple units into an auction. For example, a generator might have four units accepted and a fifth higher-cost unit that, if accepted, would be one of the last units needed to meet demand and thus affect the market

_____

[3] Section 7 of the Clayton Act covers ERCOT, a geographic region located entirely within the state of Texas.

clearing price. If that fifth unit were withheld, then ERCOT or PJM would be required to accept an even higher-priced unit, thereby increasing the market-clearing price that would benefit the generator's four other units which had been accepted. In this example, withholding the fifth unit would be profitable for the generator if it increases the market-clearing price such that increased profits from the four dispatched units attributable to that price increase exceed the lost profits that would have been earned by the fifth unit if it were offered into the market at the lower market-clearing price. This type of electricity withholding is well established in a large body of theoretical and empirical literature in economics, public policy, and electricity markets analysis.

The risk that an electricity generator such as Constellation or Calpine may profitably withhold depends in part on the generator's asset mix. A profitable withholding strategy typically requires a combination of units that confer the ability to withhold and relatively low-cost units that provide an incentive to withhold. Units that provide an incentive to withhold typically are relatively low cost and operate consistently throughout the day and across all seasons of the year. As the Complaint describes, baseload units, such as nuclear plants and some coal-fired steam turbine units, are low cost and consistently operating. Because these types of units run frequently and at operating costs lower than the market-clearing price, they benefit from the higher prices and provide a significant incentive for their owner to withhold another, higher-cost generating asset.

These higher-cost units provide the ability to raise the market-clearing price. As the Complaint describes, peaking units, such as oil- and gas-fired combustion turbine or internal combustion units, are among the highest-cost electricity generators. Peaking units are also relatively easy to turn on and shut off and typically operate during high-demand periods, often setting the market-clearing price. Mid-merit units, including combined-cycle natural gas units

and some coal steam turbines, often possess similar characteristics. As the Complaint describes, such units can typically be turned on and off or adjust their output more rapidly than baseload units. Although they are typically lower cost than peaking units, mid-merit units set the market-clearing price during periods of lower demand. This means that an owner of a peaking or mid-merit unit can raise the market-clearing price by withholding the unit. Withholding a unit is profitable to the extent that the company also owns enough low-cost units that confer incentive to at least recoup the profit foregone by withholding the unit that confers the withholding ability.

The Acquisition would likely enhance Constellation's ability and incentive to withhold electricity to raise prices in ERCOT and PJM Coastal Mid-Atlantic by giving Constellation a broader portfolio of units and a richer mix of assets. This combination of assets would enable Constellation to profitably withhold one or more units in the ERCOT and PJM day-ahead and real-time auctions to a greater degree than either it or Calpine would have had individually, leading to higher market-clearing prices.

As the Complaint alleges, through the Acquisition, Constellation is increasing its share of mid-merit and peaking units serving PJM Coastal Mid-Atlantic. The acquisition of mid-merit and peaking units would give Constellation an enhanced ability to profitably withhold in that market. The additional revenues received by Constellation's lower-cost generation units, including its nuclear plants, because of anticompetitively higher prices in PJM Coastal Mid-Atlantic would more than compensate for the lost profits from the generating unit(s) withheld.

Similarly, in ERCOT, the Complaint alleges that after the Acquisition, Constellation would control more than 12% of ERCOT's generating capacity, and over 20% of the natural gas generation units in ERCOT that often set the clearing price. As the Complaint alleges, natural gas units set the market-clearing price in ERCOT the majority of the time, making them

particularly valuable in Texas, where the electricity grid relies on gas to complement and support its increasing use of intermittent renewable resources such as sun and wind to generate electricity. Thus, the Acquisition would confer on Constellation an enhanced ability to profitably withhold. The additional revenues received by Constellation's lower-cost generating units because of anticompetitively higher market-wide prices would frequently more than compensate for the lost profits from the generating unit(s) withheld.

### 6.   Possible Entry and Expansion Unlikely to Offset Anticompetitive Effects

Entry of additional generation into either the PJM Coastal Mid-Atlantic market or ERCOT market is unlikely to be timely or sufficient in deterring or counteracting the competitive harm that may result from the Acquisition. Expansion by existing generators in those markets is similarly unlikely to occur in a sufficient and timely fashion to prevent such harm. Wholesale electricity markets feature high barriers to entry and expansion. Among those barriers, building new generation capacity in either the ERCOT and PJM Coastal Mid-Atlantic regions requires significant capital investment in generating equipment, infrastructure, and technology, and generally takes many years, considering the necessary environmental, safety, zoning, and regulatory approvals. Furthermore, the anticipated increase in electricity demand (*e.g.*, to power AI data centers) has led to long queues for the delivery of new gas turbines. There are additional barriers affecting the PJM Coastal Mid-Atlantic market. For example, building new high-voltage transmission lines that would relieve the constraints that limit the flow of electricity out of PJM Coastal Mid-Atlantic would also generally take many years, and require significant capital investment and multiple environmental, safety, zoning, and regulatory approvals.

### III.  EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The relief required by the proposed Final Judgment will remedy the loss of competition alleged in the Complaint by establishing one or more independent and economically viable competitors in the ERCOT and PJM Coastal Mid-Atlantic wholesale electricity markets.

#### A.  Divestitures

Paragraph IV.A of the proposed Final Judgment requires Defendants, within 240 calendar days after consummation of the Acquisition, to enter into a definitive contract or contracts to divest two sets of assets to an acquirer or acquirers acceptable to the United States. Allowing Defendants a 240-day period will help ensure that the transition of generation assets to an acquirer or acquirors will not occur during peak summer months.

Defendants must divest the "ERCOT Divestiture Assets" as that term is defined in Paragraph II.H of the proposed Final Judgment. The ERCOT Divestiture Assets include Calpine's Jack A. Fusco plant and Calpine's ownership interest in the Gregory plant, including all of Defendants' rights, titles, and interests in and to all property and assets, tangible and intangible, relating to or used in connection with the plants' generation, dispatch, and offer of electricity from these plants.

Defendants must also divest the "PJM Divestiture Assets" as that term is defined in Paragraph II.O of the proposed Final Judgment. The PJM Divestiture Assets include Calpine's Bethlehem, York, Hay Road, and Edge Moor plants, including all of Defendants' rights, titles, and interests in and to all property and assets, tangible and intangible, relating to or used in connection with the plants' generation, dispatch, and offer of electricity in PJM.

Defendants are responsible for divesting to an acquirer or acquirers acceptable to the United States in its sole discretion. The assets must be divested in such a way as to satisfy the United States, in its sole discretion, that the assets can and will be operated by an acquirer or

acquirers as a viable, ongoing business that can compete effectively in the ERCOT and PJM Coastal Mid-Atlantic markets. Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and must cooperate with any acquirer.

### 1. Divestiture Assets

Calpine's two ERCOT plants to be divested as part of the ERCOT Divestiture Assets are Jack A. Fusco and Gregory. Jack A. Fusco is a 557 MW combined-cycle natural gas facility located in Richmond, Texas. Gregory is a 365 MW combined-cycle natural gas facility located in Gregory, Texas. Calpine owns approximately 28.5% of Gregory.

Calpine's four PJM Coastal Mid-Atlantic plants to be divested as part of the PJM Divestiture Assets are Bethlehem, York, Hay Road, and Edge Moor. Bethlehem is a 1,134 MW natural gas-fired combined cycle plant located in Bethlehem, Pennsylvania. It began commercial operations in 2003. York comprises two generating units, known as York 1 and York 2. York 1 is a 569 MW natural gas-fired combined-cycle unit. It began operations in 2011. York 2 is an 828 MW natural gas-fired combined-cycle unit. It is newer than York 1, having begun operations in 2019, eight years later. York 1 and 2 are in Peach Bottom Township, Pennsylvania. Hay Road is a 1,136 MW dual-fuel combined cycle plant. It began commercial operations in 1989. Edge Moor is a 707 MW simple cycle natural gas-fired plant that began commercial operations in 1965. Both Hay Road and Edge Moor are in Wilmington, Delaware.

For each plant, the Defendants must divest the entirety of their rights, titles, and interests in and to all property and assets, tangible and intangible, relating to or used in connection with the generation, dispatch, and offer of electricity. This includes all real property, tangible personal property, intangible property, and intellectual property relating to each plant. This also includes all customer contracts and relationships, as well as all supply agreements. The proposed Final

Judgment defines the entirety of the assets that the Defendants must divest as the "Divestiture Assets."

The divestiture requirements of the proposed Final Judgment will maintain competition for wholesale electricity in the ERCOT and PJM Coastal Mid-Atlantic markets by allowing one or more competitors independent of the Defendants to acquire the Divestiture Assets. The proposed Final Judgment seeks to preserve competition by depriving Constellation of assets that are key to making it profitable for Constellation to withhold electricity generation to raise the market-clearing price in ERCOT and PJM's day-ahead and real-time auctions. In ERCOT, Defendants must divest the Jack A. Fusco plant and Calpine's interest in the Gregory plant. These plants are natural-gas plants, a critical fuel type in ERCOT that, as the Complaint alleges, set the market-clearing price the majority of the time. Constellation's divestiture of these plants will keep it from gaining an enhanced ability to raise the market-clearing prices in the ERCOT auctions. In the PJM Coastal Mid-Atlantic market, Defendants must divest the Bethlehem, York, Hay Road, and Edge Moor plants. These are mid-merit and peaking units, which often set the market-clearing price in the PJM Coastal Mid-Atlantic market. Divestiture of these four plants ensures that the Acquisition does not confer on Constellation an enhanced ability to withhold electricity to raise the market-clearing price and the incentive to make withholding profitable. Accordingly, the proposed Final Judgment protects competition in these markets.

## 2. Relevant Personnel

The proposed Final Judgment contains provisions intended to facilitate an acquirer's efforts to hire certain employees. Specifically, Paragraph IV.J of the proposed Final Judgment requires Defendants to provide an acquirer, the United States, and the State of Texas with organization charts and information relating to these employees and to make them available for

interviews. It also provides that Defendants must not interfere with any negotiations by an acquirer to hire these employees. In addition, for employees who elect employment with an acquirer, Defendants must waive all non-compete and non-disclosure agreements, vest all unvested pension and other equity rights, provide any pay pro rata, provide all compensation and benefits that those employees have fully or partially accrued, and provide all other benefits that the employees would generally be provided had those employees continued employment with Defendants, including but not limited to any retention bonuses or payments.

### 3. Divestiture Trustee

If Defendants do not accomplish the divestitures within the period prescribed in Paragraph IV.A of the proposed Final Judgment, Section V of the proposed Final Judgment provides that the Court will appoint a divestiture trustee selected by the United States to effect the divestiture. If a divestiture trustee is appointed, the proposed Final Judgment provides that Defendants must pay all costs and expenses of the trustee. The divestiture trustee's commission must be structured to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After the divestiture trustee's appointment becomes effective, the trustee must provide monthly reports to the United States and State of Texas setting forth his or her efforts to accomplish the divestiture. If the divestiture has not been accomplished within 180 calendar days of the divestiture trustee's appointment, the United States may make recommendations to the Court, which will enter such orders as appropriate, to carry out the purpose of the Final Judgment, including by extending the term of the divestiture trustee's appointment by a period requested by the United States.

### B. Other Provisions to Ensure Compliance

The proposed Final Judgment also contains provisions designed to promote compliance

with and make enforcement of the Final Judgment as effective as possible. Paragraph XIV.A provides that the United States and the State of Texas retain and reserve all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States or the State of Texas regarding an alleged violation of the Final Judgment, the United States or the State of Texas may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense that the Final Judgment addresses.

Paragraph XIV.B provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. The proposed Final Judgment is intended to remedy the loss of competition the United States and the State of Texas allege would otherwise result from the Acquisition. Defendants agree that they will abide by the proposed Final Judgment and that they may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph XIV.C provides that, if the Court finds in an enforcement proceeding that a Defendant has violated the Final Judgment, the United States may apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XIV.C provides that, in any successful effort by the United States or the State of Texas to enforce the Final Judgment against a

Defendant, whether litigated or resolved before litigation, the Defendant must reimburse the United States and the State of Texas for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce the Final Judgment, including the investigation of the potential violation.

Paragraph XIV.D states that the United States may file an action against a Defendant for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision, therefore, makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XV of the proposed Final Judgment provides that the Final Judgment will expire ten years from the date of its entry, except that after five years from the date of its entry, the Final Judgment may be terminated upon notice by the United States to the Court, Defendants and the State of Texas that the divestitures have been completed and continuation of the Final Judgment is no longer necessary or in the public interest.

## IV.  REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15

U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V.  PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or within 60 days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the *Federal Register* unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

> Patricia C. Corcoran
> Acting Chief, Transportation, Energy & Agriculture Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth St. NW, Suite 8000
> Washington, DC 20530
> ATR.Public-Comments-Tunney-Act-MB@usdoj.gov

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.  ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial on the merits against Defendants. The United States could have pursued litigation and sought preliminary and permanent injunctions against the Acquisition. The United States is satisfied, however, that the relief required by the proposed Final Judgment will remedy the anticompetitive effects alleged in the Complaint, preserving competition in the markets for wholesale electricity in ERCOT and PJM's Coastal Mid-Atlantic area. Thus, the proposed Final Judgment achieves all or substantially all of the relief the United States would have obtained through litigation but avoids the time, expense, and uncertainty of a full trial on the merits.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)  the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)  the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one, as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination

of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993)

(quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*,

152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16

(D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of

competing social and political interests affected by a proposed antitrust decree must be left, in

the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577

(quotation marks omitted). "The court should also bear in mind the *flexibility* of the public

interest inquiry: the court's function is not to determine whether the resulting array of rights and

liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement

is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (citation and internal

quotation marks omitted) (emphases in original); *see also United States v. Deutsche Telekom

AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding

requirements would "have enormous practical consequences for the government's ability to

negotiate future settlements," contrary to congressional intent. *Microsoft*, 56 F.3d at 1456. "The

Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded

deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give

"due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron

Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to

settlement agreements under the Tunney Act, a court must be mindful that [t]he government

need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need

only provide a factual basis for concluding that the settlements are reasonably adequate remedies

for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F.

Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (quoting *W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section

shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII.   DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: December 12, 2025                    Respectfully submitted,

                                           FOR PLAINTIFF
                                           UNITED STATES OF AMERICA

                                           /s/ Joseph Chandra Mazumdar
                                           JOSEPH CHANDRA MAZUMDAR
                                           JEREMY EVANS (D.C. Bar #478097)
                                           KATHRYN TRINKA (D.C. Bar #90010251)
                                           Trial Attorneys

                                           PAUL J. TORZILLI (D.C. Bar #986767)
                                           Senior Litigation Counsel

                                           United States Department of Justice
                                           Antitrust Division
                                           450 Fifth Street, NW
                                           Washington, DC 20530
                                           Telephone: (202) 353-1560
                                           Email: chan.mazumdar@usdoj.gov